# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BOBBI JO CRAMER, | CASE NO. 3:13-cv-02665-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION  TO VACATE THE DECISIONS OF THE COMMISIONER AND REMAND THE CASE TO THE COMISSIONER FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 8, 11, 12, 13 |

## REPORT AND RECOMMENDATION

### I.      Procedural Background

On March 08, 2010, Bobbi Jo Cramer ("Plaintiff") filed an application as a claimant for SSI under Title XVI of the Social Security Act.[1]  (Tr. 137-141).  On July 27, 2010, Plaintiff's claim was denied at the initial level of administrative review (Tr. 80, 104-108), and Plaintiff filed a request for a hearing on August 17, 2010.  (Tr. 109).  On August 29, 2011, an administrative law judge ("ALJ") held a hearing at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified.  (Tr. 35-67). On September 22, 2011, the ALJ found that Plaintiff was not disabled and not entitled to

---

[1] Plaintiff previously filed a claim which was ultimately denied by an ALJ on February 9, 2009, and Plaintiff did not appeal further.  (Tr. 68-79).

benefits.  (Tr. 82-103).  On November 22, 2011, Plaintiff filed a request for review with the Appeals Council (Tr. 15-16), which the Appeals Council denied on August 26, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On December 21, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On February 6, 2014, the Commissioner ("Defendant") filed an answer and administrative transcript of proceedings. (Docs. 8, 9).  On March 25, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief") (Doc. 11).  On April 24, 2014, Defendant filed a brief in response ("Def. Brief") (Doc. 12).  On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge.  Plaintiff filed a brief in reply on May 8, 2014 ("Pl. Reply")(Doc. 13).

## II. Relevant Facts in the Record

Plaintiff was born December 9, 1972, and thus was 37 years old on her protective application date (Tr. 137).  She completed the twelfth grade and last worked as a waitress in 1998, stopping due to "personal" reasons (Tr. 155-56), separately stating without further elaboration that she 'smashed' her arm until she 'broke it' because she did not want to return to work.  (Tr. 471).  Plaintiff alleges disability due to a combination of impairments including

degenerative disc disease of the cervical and lumbar spine, fibromyalgia, major depressive disorder, and panic disorder with agoraphobia.  (Tr. 73).

### A.  Relevant Treatment History and Medical Opinions

### 1.  Mark Cruciani, M.D. – Treatment Records, June 8, 2009 to July 17, 2011, including Physical and Psychological RFC Assessments, July 12, 2011

Mark Cruciani has served as Plaintiff's pain management specialist since 2006.  Pl. Brief at 2, 5.  The record reveals a handful of visits from June 2009 and July 2011, resulting in twelve pages of medical records.  (Tr. 206-207, 461-468, 476-477).  In a treatment record dated June 8, 2009, Dr. Cruciani noted that Plaintiff was having difficulty sleeping, and had a history which included depression and a panic disorder.  (Tr. 207).  In the June 2009 treatment record, Dr. Cruciani opined that he did not believe Plaintiff was capable of gainful employment, however, did not provide an explanation or rationale for the opinion.  (Tr. 207).  In a treatment record dated December 7, 2009, Dr. Cruciani noted that Plaintiff was able to carry out activities in daily living and that she was alert and oriented as to time, place, and person.  (Tr. 206).  In a treatment record dated June 14, 2010, Dr. Cruciani noted that Plaintiff was able to carry out activities in daily living and that she was alert and oriented as to time, place, and person.  (Tr. 466).  In a treatment record dated October 26, 2010, Dr. Cruciani noted that Plaintiff was able to carry out activities in daily living and that she was alert and oriented as to time, place, and person.  (Tr.

467).  In a treatment record dated December 13, 2010, Dr. Cruciani noted that Plaintiff continued having problems with her medications, particularly; Lexapro (used to treat major depressive disorder) was causing heart racing and anxiety.[2]  (Tr. 468).  In the December 2010 treatment record, Dr. Cruciani also noted that Plaintiff was able to carry out activities in daily living and that she was alert and oriented as to time, place, and person.  (Tr. 468).

Dr. Cruciani completed a Mental Residual Functional Capacity Assessment of Plaintiff, dated July 12, 2011, in which he found, inter alia, that Plaintiff had: severe impairment in her ability to: 1) maintain attention and concentration for at least two straight hours; and 2) complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 464-465).  Although not treating Plaintiff directly for psychological impairments, Dr. Cruciani noted that the Plaintiff's pain symptoms related to psychological conditions, notably that the Plaintiff's depression, anxiety and panic attacks affect her pain and detailing that the Plaintiff's pain can be so incapacitating that it forces her to lose focus and was constantly severe enough to interfere with her attention and concentration.  (Tr. 463).  Dr. Cruciani also found Plaintiff's impairment would be increased by attendance requirements, the need to make accurate decisions quickly, and that a routine, entry level job would actually serve as a stressor.  (Tr. 464-65).  Dr. Cruciani stated that Plaintiff had experienced the above described level of impairment since December 2009.  (Tr. 464-65).  An EMG/Nerve conduction study dated March 12, 2009,

---

[2] FDA, Lexapro: Indications and Usage, available at
http://www.accessdata.fda.gov/drugsatfda_docs/label/2014/021323s044,021365s032lbl.pdf (last visited Nov. 10, 2014)

was submitted to Dr. Cruciani.  (Tr. 476-477).  The nerve conduction study addressed a prior MRI record, addressed the arms and spine, and involved a physical examination.  (Tr. 487-477).  Overall, the EMG/Nerve conduction study reported normal findings and concluded that "[c]onservative therapy is normal[ly] attempted for minor radicular symptoms" and recommended Plaintiff to follow-up with Dr. Cruciani and Dr. Mirza.  (Tr. 476-477).

### 2.   Wasique Mirza, M.D. – Primary Care Treatment Records January 13, 2009 to July 08, 2011 and Physical RFC, July 19, 2011

Dr. Wasique Mirza has been Plaintiff's primary care physician for several years through the Scranton Primary Care Center.  (Tr. 276-301, 448-460).  Plaintiff's records from Dr. Mirza indicate treating Plaintiff for psychological symptoms of anxiety by prescribing and making adjustments to psychotropic medication.  (Tr. 276-96, 453-58).  For example, Dr. Mirza adjusted Restoril which is used to aid in sleeping[3] and Ativan which is used in the management of anxiety disorders or anxiety associated with depressive symptoms.[4]  (Tr. 293).  Also, when treating Plaintiff for chest pain, Dr. Mirza concluded that the pain was due to Plaintiff's anxiety.  (Tr. 295).  Dr. Mirza also completed a Functional Capacity Evaluation of Plaintiff on July 19, 2011.  (Tr. 449-451).  Dr. Mirza opined that Plaintiff could rarely lift one to five pounds, stand and walk less than one hour and sit for one hour in an eight-hour workday, never squat or crawl,

---

[3] FDA, Restoril: Indications and Usage, available at
http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/018163s054lbl.pdf (last visited Nov. 10, 2014)
[4] FDA, Ativan: Indications and Usage, available at
http://www.accessdata.fda.gov/drugsatfda_docs/label/2007/017794s034s035lbl.pdf (last visited Nov. 10, 2014)

occasionally bend and climb stairs, and frequently reach, and would have environmental limitations and psychological conditions affecting her pain that were significant enough to frequently interfere with attention and concentration.  (Tr. 449-51).  He indicated his belief that she had this level of impairment for more than one year.  (Tr. 449-451).

### 3.  Elizabeth Ciaravino, Ph.D. – Consultative Examination Report, June 23, 2010

In June 2010, Plaintiff underwent a consultative examination with Dr. Elizabeth Ciaravino.  (Tr. 356).   After the examination, Dr. Ciaravino determined that Plaintiff had a history of panic disorder with agoraphobia and a history of bipolar disorder, and assessed a global assessment of functioning (GAF) score of 50.  (Tr. 356).  According to Dr. Ciaravino, Plaintiff "was experiencing an extreme amount of difficulties with anxiety as well as anger. . . . [and her] appearance was noteworthy from an extreme amount of sweating."  (Tr. 355).  Dr. Ciaravino further opined that Plaintiff had moderate limitations in her ability to understand, remember, and carry out short, simple instructions, but marked limitations in all other work-related mental activities.  (Tr. 359-60).   As support for her conclusions, Dr. Ciaravino cited Plaintiff's elevated anxiety, anger around others, reports of numerous instances of social difficulties and demonstrated anger when asked to concentrate.  (Tr. 359).  Dr. Ciaravino completed an evaluation of Plaintiff's ability to perform work related activities (Tr. 358-360) and found marked impairments in her ability to: 1) understand, remember and carry out detailed instructions; 2) make judgments and simple work-related decisions; 3) interact appropriately

with the public, supervisors or co-workers; 4) respond appropriately to work pressures in a usual work setting; and 5) respond appropriately to changes in a work setting.  Dr. Ciaravino further found moderate impairments with regard to her ability to understand and carry out short simple instructions.  (Tr. 359).

### 4.   Thomas P. Smith, Psy.D. – Psychological report, August 4, 2011

In August 2011, Plaintiff was referred for a psychological evaluation with Dr. Thomas Smith, who observed that Plaintiff was alert and oriented, clean and neatly attired, had good eye contact, had behavior and psychomotor activity within the normal range.  (Tr. 469).  Dr. Smith noted that, throughout the interview, Plaintiff's affect was anxious with a labile style, often exhibiting tearful, worried and depressed states.  (Tr. 469-475).  Plaintiff gave a history of self-abusive behavior and cutting since her adolescence, until two years prior to the psychiatric evaluation with Dr. Smith.  (Tr. 471).  Regarding employment history, Plaintiff recalled that she last worked as a waitress and due to not wanting to return to work; she "smashed [her] arm until [she] broke it."  (Tr. 471).  Dr. Smith diagnosed Plaintiff with bipolar disorder, most recent episode mixed; post-traumatic stress disorder (PTSD); and panic disorder with agoraphobia.  (Tr. 472-74).  Dr. Smith concluded that Plaintiff had moderately severe limitations in most areas of work-related functioning, with severe limitations in several areas with regard to social interaction.  (Tr. 472-74).

### 5.   Leo Potera, M.D., State Agency Physician – Physical RFC Assessment, July 26, 2010

Reviewing state agency physician Dr. Potera found that Plaintiff's treatment for her physical impairments were routine and conservative in nature.  (Tr. 386).  Dr. Potera indicated that his review did not include treating or examining source statements regarding Plaintiff's physical capacities (treating source statements were not made until 2011).  (Tr. 385).  Dr. Potera opined that Plaintiff was capable of performing light work, but was limited from repetitive use of her lower extremities due to pain and that she could occasionally balance, stoop, kneel, crouch, crawl, use ramps, and climb stairs and ladders, but should never climb ropes or scaffolds and should avoid concentrated exposure to potential respiratory irritants and hazards.  (Tr. 381-87).

### 6.  Ira Gensemer, Ed.D., State Agency Physician – Psychological RFC Assessment, July 12, 2010, Physical RFC Assessment, July 26, 2010

Reviewing state agency psychologist Ira Gensemer, Ed.D., found that Plaintiff had only mild limitations in activities of daily living, moderate limitations in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace.  (Tr. 374).  At the time of Dr. Gensemer's July 2010 assessment, treating or examining source statements were not available for review.  Overall, Dr. Gensemer opined that Plaintiff retained the ability to understand, retain, and follow simple job instructions, make simple decisions, function in production-oriented jobs requiring little independent decision-making, and perform repetitive work activities.  (Tr. 377-79).  Dr. Gensemer concluded that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations

resulting from her mental impairments.  (Tr. 377-79).

### 7.   Scranton Counseling Center – Progress Notes June 29, 2006 to April 13, 2011

Plaintiff's June 2006 intake form from Scranton Counseling Center ("SCC"), reflects primary complaints of ongoing anxiety and depression, and outpatient treatment as a child.  (Tr. 261-275).  In the June 2006 intake, it was noted that Plaintiff had poor memory, good insight regarding problems, good judgment, and adequate concentration and denied problems with impulse control.  (Tr. 261-275).  Plaintiff was originally diagnosed as having panic disorder, agoraphobia and major depressive disorder.  (Tr. 261-275).  She was given a GAF of 45 with a note that the highest GAF within the past year was 55.  (Tr. 261-275).  Since the initial intake, Plaintiff had received counseling totaling thirty times from July 7, 2006, to April 13, 2011, averaging a thirty minute counseling session every two months.   (Tr. 230-275, 418-436). Throughout the treatment with SCC, the treatment records do not address the patient's functional capacity.  (Tr. 230-275, 418-436).   The progress notes from these counseling sessions are a combination of check marks describing Plaintiff's mood and behavior, accompanied by a couple of sentences regarding Plaintiff's chief concern.   (Tr. 230-275-418-436).   Throughout the counseling sessions, Plaintiff is often noted to be alert and oriented as to self, time and place; with repeated complaints regarding anxiety and depression.  (Tr. 230-275, 418-436).

On November 28, 2006 (Tr. 255); January 23, 2007 (Tr. 254); May 31, 2007 (Tr. 252); November 27, 2007 (Tr. 249), September 1, 2010 (Tr. 423); the effectiveness of the medication

was questioned and adjusted.  On August 11, 2006 (Tr. 256), and March 3, 2009 (Tr. 237), Plaintiff explained that she was not compliant with treatment due to being unable to afford the medication.  Progress notes from July 21, 2008 (Tr. 241); November 24, 2009 (Tr. 236); May 11, 2010 (Tr. 418-19); July 7, 2010 (Tr. 422); September 1, 2010 (Tr. 423); and October 27, 2010 (Tr. 426); reflect a history of childhood trauma.  The SCC records reveal at least seven "no shows" (on July 27, 2006; April 16, 2007; February 19, 2008; May 21, 2008; March 26, 2009; January 26, 2010; and April 8, 2010), a few treatment records with a goal of keeping scheduled appointments, and a note on December 22, 2010, that Plaintiff rarely keeps treatment appointments.  (Tr. 230-275, 418-436).  On May 11, 2010 (Tr. 419), July 7, 2010 (Tr. 422), September 1, 2010 (Tr. 423); counselors repeatedly recommended for Plaintiff to call the Women's Resource Center (WRC) for group counseling, however, it does not appear that she had followed through with the recommendation.

### 8.  Community Medical Center – Emergency Department Records, April 19, 2009 to February 4, 2011

Plaintiff submitted emergency department records which at different times addressed breathing symptoms and acute pain.  (Tr. 305-353, 363-363, 403-417).  On April 19, 2009, when Plaintiff sought treatment to address breathing problems, it was observed that there were not any obvious signs of discomfort and there were not any functional limitations that impacted her mobility and personal hygiene.  (Tr. 323).  On August 27, 2009, when Plaintiff sought treatment

for back pain, it was noted that her condition would not impact her mobility or daily life activities, however, it was noted that the pain worsened upon movement and she was diagnosed with acute low back pain and back sprain.  (Tr. 332-336).  On February 4, 2011, Plaintiff sought treatment for back pain, and was diagnosed with acute back pain and back sprain.  (Tr. 403-410).  It was noted that pain increased with movement, and it was noted that her condition would not impact her mobility or daily life activities.  (Tr. 403-410).  Plaintiff was restricted from lifting more than ten pounds.  (Tr. 403-410).  On June 23, 2010, Plaintiff sought treatment for shoulder pain following an injury resulting from throwing a ball.  (Tr. 612).  It was noted that she had a decreased range of motion due to the shoulder pain.

### III.      Review of ALJ Decision

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995)), and may be less than a preponderance.   *Jones*, 364 F.3d at 503.   If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.   *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).   A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process is used to determine if a person is eligible for disability benefits.   20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428.   If the

Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed.  20 C.F.R. § 404.1520(a)(4).  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.  Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The claimant bears the burden of proof at steps one through four.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993).  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## A.  Credibility Determination of Plaintiff

The Court finds that the ALJ erred in finding Plaintiff not credible.  The Commissioner must explicitly weigh all relevant, probative, and available evidence; and provide some

explanation for a rejection of probative evidence which would suggest a contrary disposition. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). The Commissioner may properly accept some parts of the medical evidence and reject other parts, but must consider all the evidence and give some reason for discounting the rejected evidence. *Id.* In this instance, in finding Plaintiff not credible, the ALJ explained "[Plaintiff] stopped working in 1998, long before her alleged disability onset date, for "personal" reasons (Exhibit 2E; see also Exhibit 4D). [Plaintiff's] work history raises questions as to whether her current state of unemployment is truly the result of medical problems." (Tr. 98). However, the ALJ failed to address probative evidence that may suggest a contrary conclusion. The report from Dr. Smith states that Plaintiff had a history of self-abusive behavior and that Plaintiff 'smashed' her arm until she 'broke it' because she did not want to return to work. (Tr. 471). A possible conclusion from this evidence is that a psychiatric disability leading to the broken arm was the reason for Plaintiff's unemployment. *See* Tr. 471. Although an ALJ could conclude to the contrary, it is the ALJ's duty to explicitly address the evidence and give a reason for rejecting the evidence in the first instance. *See Adorno v. Shalala*, 40 F.3d 43, 48.

The ALJ's flawed credibility finding is not harmless error, because Plaintiff's subjective descriptions of symptoms are the stated basis for the ALJ's giving limited weight to all of the medical opinions that support a finding of Plaintiff's disability. Remand is necessary for the

Commissioner to properly account of all probative evidence as it relates to the weight of Plaintiff's credibility.

### B.  Allocation of Weight to Medical Opinions

Plaintiff contends the ALJ committed reversible error by failing to give good reasons for giving limited weight to the opinions of examining and treating psychologists and physicians in determining Plaintiff's RFC.  Pl. Br. at 11, Doc 11.  Plaintiff's treating physicians, Dr. Cruciani and Dr. Mirza; the consultative examiner, Dr. Ciaravino; and the independent examiner, Dr. Smith all examined Plaintiff and submitted a functional capacity assessment.  *Supra* Section II, "Relevant Facts in the Record."

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole.  20 C.F.R. § 404.1527(c)(3)-(4).  The opinions of specialists are generally given greater weight than non-specialists.  The consistency of medical opinions with the record is also significant.  20 C.F.R. §404.1527(c)(4)&(5).

An ALJ should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.  *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008).  An administrative law judge must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's

opinion on the basis of contradictory medical evidence, not on the administrative law judge's own credibility judgments, speculation or lay opinion. *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) (The ALJ may not substitute his own judgment for that of a physician).   The regulations require that the Commissioner "give good reasons in [the] notice of determination or decision" for the weight assigned to the treating source's opinion.  20 C.F.R. § 404.1527(d)(2); S.S.R. 96–2p, 1996 WL 374188, at *5.  The failure to provide "good reasons" for not crediting a treating source's opinion is a ground for remand.  *See* 20 C.F.R. 404.1527(d)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir.2001) (noting that failure to comply with 20 C.F.R. 404.1527(d)(2) warrants a remand).

However, a treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence.  20 C.F.R. § 404.1527(c)(2); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion.  *Id.*  The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled.  *Id.*  Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

Medical opinions consisting largely of checked boxes absent of narrative citing to reasons

and evidence to support findings are afforded less weight than opinions which include detailed narratives citing to objective medical evidence.  *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (explaining more weight is given to opinions that include objective medical evidence); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("[F]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *Knox v. Comm'r of Soc. Sec.*, 365 Fed.Appx. 363, 367-67 (2010) (finding that ALJ properly discounted treating physician's check-list opinion because its conclusions were not supported by objective narrative of any specificity.).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination.  20 C.F.R. § 404.1527(d)(1)-(2); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011).  "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."  *Chandler*, 667 F.3d at 361; *Coleman v. Astrue*, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

### 1.  Weight to Opinion of Dr. Cruciani, Treating Physician

The ALJ afforded little weight to the opinion of treating physician, Dr. Cruciani.  (Tr. 97).  Regarding Dr. Cruciani's assessment of Plaintiff's physical limitations, the ALJ determined that such assessment was not consistent with the overall medical evidence and appeared to be

based largely on Plaintiff's subjective complaints and not objective medical evidence.  (Tr. 97).
The ALJ further opined that the opinion exaggerated the Plaintiff's limitations and was not
consistent with Plaintiff's "rather benign clinical findings and conservative treatment."  (Tr. 97).
The ALJ added that since Dr. Cruciani was not treating the Plaintiff for her alleged mental
impairments, his opinion regarding any psychological limitation would be given limited weight.
(Tr. 97).

As summarized above, Dr. Cruciani has served as Plaintiff's pain management specialist
since 2006 and the record reveals a handful of visits from June 2009 and July 2011, resulting in
twelve pages of medical records.  (Tr. 206-207, 461-468, 476-477).  Although in the June 2009
treatment record, Dr. Cruciani opined that he did not believe Plaintiff was capable of gainful
employment, he did not provide an explanation or rationale for the opinion.  (Tr. 207).  The
majority of the records do not address Plaintiff's limitations, but rather, generally note that
Plaintiff was able to carry out activities in daily living and that she was alert and oriented as to
time, place, and person.  (Tr. 206-207, 461-468, 476-477).

The ALJ erred in discounting the treating physician's medical opinion based on the
ALJ's own lay opinion that the physician's treatment was "conservative."  *See Morales v. Apfel*,
225 F.3d 310 at 317-18; *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (The ALJ
may not impose his notion that the severity of a physical impairment directly correlates with the
intrusiveness of the medical treatment ordered).  This error, however, is harmless in light of the

record of Dr. Cruciani's treatment and given that the ALJ's characterization of Plaintiff's treatment is supported by reviewing state agency physician; Dr. Potera, who found that Plaintiff's treatment for physical impairments to be routine and conservative in nature. (Tr. 386). Thus, the ALJ's weight determination of Dr. Cruciani is supported by substantial evidence.

### 2.   Weight to Opinion of Dr. Mirza, Treating Physician

The ALJ afforded little weight to the opinion of treating physician, Dr. Mirza. (Tr. 97). Regarding Dr. Mirza's assessment of Plaintiff's physical limitations, the ALJ determined that such assessment was not consistent with the overall medical evidence and appeared to be based largely on Plaintiff's subjective complaints and not objective medical evidence. (Tr. 97). As with Dr. Cruciani, the ALJ further opined that Dr. Mirza's opinion exaggerated the Plaintiff's limitations and was not consistent with Plaintiff's "rather benign clinical findings and conservative treatment." (Tr. 97). The ALJ added that since Dr. Mirza was not treating the Plaintiff for her alleged mental impairments, his opinion regarding any psychological limitation would be given limited weight. (Tr. 97).

As summarized above, Dr. Wasique Mirza has been Plaintiff's primary care physician for several years through the Scranton Primary Care Center. (Tr. 276-301, 448-460). Plaintiff's records from Dr. Mirza indicate treating Plaintiff for psychological symptoms of anxiety by prescribing and making adjustments to psychotropic medication. (Tr. 276-96, 453-58). Moreover, when treating Plaintiff for chest pain, Dr. Mirza concluded that the pain was due to

Plaintiff's anxiety.   (Tr. 295).   Dr. Mirza opined that Plaintiff would have environmental limitations and psychological conditions affecting her pain that were significant enough to interfere with attention and concentration frequently.  (Tr. 449-51).

The ALJ erred in affording little weight to Dr. Mirza's opinion on the grounds that the opinion appeared to be based largely on Plaintiff's subjective complaint rather than objective medical evidence, and that Dr. Mirza was not treating the Plaintiff for her alleged mental impairments.  As discussed above, the ALJ's credibility determination of the Plaintiff was made in error.  The ALJ erred in discrediting a treating physician's opinion on the basis that such opinion relied on subjective complaints of Plaintiff, when the ALJ erroneously found Plaintiff not credible.  *See Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (finding that a treating physician's opinion may not be rejected based on a credibility determination).

Given that the ALJ gave the same weight rationale for both Dr. Mirza and Dr. Cruciani at the same time, it is unclear whether the ALJ considered the opinion from Dr. Mirza as addressing mental impairments.  For clarity, the Court finds that Dr. Mirza, a treating physician who is not a mental health expert, is qualified to give an opinion as to plaintiff's mental conditions when he has had the opportunity to evaluate and treat Plaintiff for mental conditions.  *See Heinze v. Heckler,* 581 F.Supp. 13, 14 (E.D. Pa. 1983) (finding that under general principles of evidence law, treating physician was qualified to give a medical opinion as to a plaintiff's mental state when the record showed that physician could form the basis of the diagnosis); reasoning adopted

by *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); accord *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995), as amended (Apr. 9, 1996) (elaborating that providing diagnosis or prescribing medication to treat mental illness demonstrates that the physician was treating a mental illness).   The record reflects that Dr. Mirza did, in fact, treat Plaintiff for mental impairments through prescribing and adjusting medication related the Plaintiff's psychological impairments.   Based on the foregoing, the ALJ erred in assessing the weight allotted to Dr. Mirza's opinion.

### 3.   Weight to Opinion of Dr. Ciaravino, Consultative Examiner

The ALJ afforded little weight to the opinion of the consultative examiner, Dr. Ciaravino. (Tr. 97).   Regarding Dr. Ciaravino's assessment of Plaintiff's restrictions in work-related mental activities and Plaintiff's GAF score, the ALJ found that such assessments were not consistent with the overall medical evidence, including Plaintiff's treatment records from Scranton Counseling, which, according to the ALJ, showed improvement with treatment and a stable mood.   (Tr. 97).   The ALJ further determined that Dr. Ciaravino's assessment appeared "to be based on a single encounter with [Plaintiff] and largely reflects [Plaintiff's]'s reported limitations and subjective complaints."   (Tr. 97).

As summarized above, in June 2010, Plaintiff underwent a consultative examination with Dr. Ciaravino, who noted Plaintiff's history of panic disorder with agoraphobia and history of bipolar disorder, and assessed a global assessment of functioning (GAF) score of 50.   (Tr. 356).

According to Dr. Ciaravino, Plaintiff "was experiencing an extreme amount of difficulties with anxiety as well as anger. . . . [and her] appearance was noteworthy from an extreme amount of sweating." (Tr. 355).  Dr. Ciaravino further opined that Plaintiff had moderate limitations in her ability to understand, remember, and carry out short, simple instructions, but marked limitations in all other work-related mental activities (Tr. 359-60).  Dr. Ciaravino further found moderate impairments with regard to her ability to understand and carry out short simple instructions.  (Tr. 359).

The ALJ erred in affording little weight to Dr. Ciaravino on the grounds that the opinion appeared to be based largely on Plaintiff's subjective complaints.  As discussed above, the ALJ's credibility determination of Plaintiff was made in error.  The ALJ erred in discrediting a Dr. Ciaravino's opinion on the basis that such opinion relied on subjective complaints of Plaintiff, when the ALJ erroneously found Plaintiff not credible.  Additionally, the ALJ reliance on progress notes from Scranton Counseling, which, do not necessarily demonstrate improvement and amounts to the ALJ impermissibly interpreting medical evidence.  *See Morales v. Apfel*, 225 F.3d 310 at 317-18.  Finally, Dr. Ciaravino did in fact make objective assessments, specifically observing Plaintiff's unusual profuse sweating, assessing Plaintiff's ability to carry out instructions, and noting angered responses to questions.

### 4.   Weight to opinion of Dr. Smith, Independent Examiner

The ALJ afforded little weight to the opinion of the independent examiner, Dr. Smith.

Page **22** of **27**

The ALJ reasoned that Dr. Smith "relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff] reported."   (Tr. 97).   The ALJ continued, "as explained elsewhere in this decision, there exist good reasons for questioning the reliability of [Plaintiff]'s subjective complaints."   (Tr. 97).   The ALJ reasoned that since Plaintiff's examination stemmed from an attorney referral for the purpose of generating evidence rather than for the purpose of seeking treatment, and presumably Dr. Smith's report was paid for, notwithstanding the report's legitimacy and deserving due consideration, such circumstances detract from the report.   (Tr. 97).

The ALJ erred in affording little weight to Dr. Ciaravino on the grounds that the opinion appeared to be based largely on Plaintiff's subjective complaints.   As discussed above, the ALJ's credibility determination of Plaintiff was made in error.   The ALJ erred in discrediting a Dr. Smith's opinion on the basis that such opinion relied on subjective complaints of Plaintiff, when the ALJ erroneously found Plaintiff not credible.   Moreover, Dr. Smith did in fact make objective assessments, specifically observing that Plaintiff was alert and oriented, clean and neatly attired, had good eye contact, had behavior and psychomotor activity within the normal range, and was anxious with a tense affect.   (Tr. 469).   Additionally, Dr. Smith noted that, throughout the interview, Plaintiff's affect was anxious with a labile style, often exhibiting tearful, worried and depressed states.   (Tr. 469-475).

### 5.   Weight to Opinion of Dr. Potera, State Agency Physician

The ALJ afforded some weight to the opinion of state agency physician, Dr. Potera, affording greater weight to Plaintiff's subjective complaints regarding the effect of her impairments.   (Tr. 97).   The ALJ explained that although Dr. Potera's assessment of Plaintiff's physical residual functional capacity is relatively consistent with the other medical evidence of record, the ALJ would give Plaintiff some additional benefit of the doubt and reduce Plaintiff's residual functional capacity to "a more restricted range within the sedentary exertional level." (Tr. 97).

As summarized above, reviewing state agency physician, Dr. Potera found that Plaintiff's treatment for her physical impairments were routine and conservative in nature.   (Tr. 386).   At the time of Dr. Potera's July 2010 assessment, the July 2011 RFC assessment from Dr. Mirza was not available for review.   Dr. Potera opined that Plaintiff was capable of performing light work, but was limited from repetitive use of her lower extremities due to pain and that she could occasionally balance, stoop, kneel, crouch, crawl, use ramps, and climb stairs and ladders, but should never climb ropes or scaffolds and should avoid concentrated exposure to potential respiratory irritants and hazards (Tr. 381-87).

Given that Dr. Potera did not examine Plaintiff and his review did not include subsequent treating or examining source statements regarding Plaintiff's physical capacities, the ALJ did not err in affording Dr. Potera's opinion some weight but affording greater weight to Plaintiff's

subjective complaints regarding the effect of her impairments.

### 6.   Weight to opinion of Dr. Gensemer, Independent Examiner

The ALJ afforded great weight to the opinion of state agency physician, Dr. Gensemer. The ALJ explained that Dr. Gensemer's opinion was well-reasoned and "consistent with and supported by the other evidence of record when considered in its entirety." (Tr. 97)

As summarized above, Dr. Gensemer, found that Plaintiff had only mild limitations in activities of daily living, moderate limitations in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 374). Overall, Dr. Gensemer opined that Plaintiff retained the ability to understand, retain, and follow simple job instructions, make simple decisions, function in production-oriented jobs requiring little independent decision-making, and perform repetitive work activities, and concluded that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her mental impairments. (Tr. 377-79).

The Court notes that that Dr. Gensemer's opinion cited objective medical evidence and included a substantive narrative explanation in support of the check-box findings. However, Dr. Gensemer did not examine Plaintiff and his review did not include treating or examining source statements regarding Plaintiff's physical capacities. In totality of the abovementioned credibility error and error in weight allotted to the treating and examining physician opinions, the ALJ erred in affording Dr. Gensemer's opinion greater weight over the treating and examining physicians.

## IV.    Recommendation

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence in accordance with the Court's above report; and

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.

///
///
///
///
///
///
///
///
///
///

A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept,

reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: November 21, 2014

s/Gerald B. Cohn

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE